## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYLE CHESWICK, individually and on behalf of all others similarly situated, | Case No.: 1:25-cv-6795 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>**JURY TRIAL DEMANDED**</u> |
| MITRA-9 Brands, LLC, | |
| Defendant. | |

Plaintiff Lyle Cheswick ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Mitra-9 Brands, LLC ("Defendant").

## <u>NATURE OF THE ACTION</u>

1. This is a civil class action lawsuit against Defendant Mitra-9 Brands, LLC for false, misleading, deceptive, and negligent sales practices regarding its kratom seltzers, powders, and shots (the "Products").[1]  Kratom is a dried leaf that is sold as a loose powder, packaged into capsules, or made into an extract.  However, what reasonable consumers do not know, and Defendant fails to disclose, is that the "active ingredients" in kratom are similar to opioids.  That is, kratom works on the exact same opioid receptors in the human brain as morphine and its analogs, has similar effects as such, and critically, has a similar risk of physical addiction and dependency, with similar withdrawal symptoms.  When reasonable consumers think of opiates and opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, and morphine; they do not expect that the "all natural" product bought at their local corner store operates like an opioid,

---

[1] The Products include all Mitra9 Kratom seltzers in their varying flavors, the kratom powder drink mixes in their varying flavors, and the kava kratom shots in their varying flavors.

with similar addiction and dependency risks. Kratom is perniciously addictive – on an entirely different level than caffeine – and it has sunk its hooks into tens of thousands of unsuspecting consumers and caused them serious physical, psychological, and financial harm. Defendant has intentionally and negligently failed to disclose these material facts anywhere on its labeling, packaging, or marketing materials, and it has violated warranty law and state consumer protection laws in the process.

2.      Defendant relies on its Products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping profits along the way. Reasonable consumers do not expect the seltzers, pouches of kratom powder, and shots, which they can purchase at gas stations and corner stores, to contain a Product with the same addictive potential of morphine and its analogs. Defendant relies on this ignorance and does nothing to correct it. Such activity is outrageous and is in contravention of New York law and public policy.

3.      Defendant and its officers have engaged in a systemic effort to peddle an addictive substance to unsuspecting and oftentimes vulnerable consumers. Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of Defendant's Products, for: (i) violation of New York's General Business Law (GBL) § 349; (ii) New York's GBL § 350; and (iii) fraud by omission.

## **PARTIES**

4.      Plaintiff Lyle Cheswick is a citizen and resident of New York, New York. He first purchased the Products in or around early 2024 in New York City. Plaintiff first heard about kratom online where he read it was an alternative for pain relief. Plaintiff was not informed, however, that kratom can be addictive and that using it can lead to physical

dependence.  As such, Plaintiff Cheswick did not believe kratom could be harmful and was not aware that kratom carried a potential risk of addiction and physical dependence.  Plaintiff Cheswick has purchased many of Defendant's Products including the kratom seltzers and kava kratom shots and last purchased them in or around the beginning of August 2025.  Plaintiff Cheswick reviewed the Products' packaging before making his purchase and relied on Defendant's representations and omissions in deciding to purchase the Products.  Unfortunately, the Products' labels did not have an addiction or dependence warning.  Several months after beginning to consume the Products, Plaintiff Cheswick first experienced withdrawals including cold sweats, anxiety, joint aches, extreme irritability, restless leg syndrome, and insomnia. Plaintiff Cheswick had never experienced anything like that before.  Had Plaintiff Cheswick known that the Products were highly addictive, or posed a risk of addiction, by way of a warning on the Products' packaging, he would have never purchased them.  In other words, Defendant's omission of an addiction warning was material to his purchasing decision.

5.      Defendant Mitra-9 Brands, LLC is a Florida limited liability company with its headquarters located in Fort Myers, Florida.  Defendant markets, sells, and distributes the Products throughout the United States, including in New York.  Defendant manufactured, marketed, and sold the Products at issue at all times during the relevant class period.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

7.      This Court has personal jurisdiction over the parties because Plaintiff Cheswick resides in New York, is a citizen of New York, and submits to the jurisdiction of the Court, and because Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, business in this District.  Defendant therefore has sufficient minimum contacts with this state, including within this District, and/or intentionally availed itself of the benefits and privileges of the New York consumer market through the promotion, marketing, and sale of its products to residents within this District and throughout this State.  Additionally, Defendant marketed and sold its kratom Products to Plaintiff in this District.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because regularly does business in this District and the same misrepresentations, omissions, and injures giving rise to the claims alleged herein have occurred in this District.

## FACTUAL ALLEGATIONS

### A.      Background and Pharmacology of Kratom

9.      "Kratom" refers to the substance derived from the leaves of a tropical tree, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century.  Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium.  Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

10.     Kratom is one of the most widely used drugs in Thailand.  This popularity does not mean Thailand believes kratom is harmless.  To the contrary, Thailand understands that

kratom is dangerous, as demonstrated by its ban of the substance in 1943.[2]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

11.    Kratom's varying, dose-dependent, effects have historically been part of its appeal.  For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also as an analgesic or for relaxation by brewing kratom into a tea.

12.    In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

13.    To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[3]

14.    The chemicals in the kratom plant which produce a psychoactive effect when ingested are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic chemical compounds.  The primary alkaloids in kratom leaves responsible for kratom's effects are mitragynine ("MG") and 7-hydroxymitragynine ("7-OH").

15.    MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2

---

[2] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

[3] When kratom leaves are extracted into a liquid formulation, this is colloquially called a kratom "extract shot."

adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

16.    Most crucially, MG and 7-OH interact with the mu-opioid receptor.  The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia.  For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

17.    MG and 7-OH cause a variety of pharmacological effects depending on their potency, resulting in a highly dose-dependent response to each kratom product.  For example, a low dose (0.5 grams to 3 grams) is typically described as stimulating or energizing, whereas a high dose (3+ grams) is typically described as euphoric, sedating, and analgesic.  Nonetheless, in sufficient doses, kratom's effects are substantially similar to those of opioids and other drugs.

18.     Accordingly, kratom is referred to as a "quasi-opiate" by health professionals because of its opioid-like characteristics.  This concept that kratom is essentially an opioid is affirmed by several facts: first, as discussed above, kratom's effects are substantially similar to those of opioids; second, kratom alleviates opioid withdraw symptoms; and third, repeated use of kratom causes opioid withdrawal symptoms.

19.    Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop but cannot.

20.    All substances that act on the opioid receptors carry a high risk of addiction, and kratom is no exception.  Addiction occurs when an opioid is ingested on a regular basis and, over

time, the user develops a tolerance to the drug that requires the user to consume an increased

dose of the drug to achieve the same effects a lower dose previously had. As these doses

increase, the body becomes dependent on the drug to feel normal and function properly. When

the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs.

Withdrawal symptoms cause the user to feel much worse than they did before they started taking

the drug and can be extremely painful and intolerable to the user.

21.     Indeed, kratom withdrawal symptoms are very similar to those of traditional

opioid withdrawal. These symptoms include irritability, anxiety, difficulty concentrating,

depression, sleep disturbance, including restless legs, tearing up, runny nose, muscle and bone

pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature,

extreme dysphoria, and malaise.

22.     Users typically start substances like kratom because of how good it makes them

feel, but once addicted, they use kratom to avoid the pain and sickness of withdrawal. Use is no

longer is about getting high, but about not feeling "sick."

23.     Kratom users state that kratom addiction is unique in the way it sneaks up on

them. What is particularly insidious about kratom, they describe, is that because they are

unaware of kratom's negative side effects and its addictive potential, when they begin to

experience the negative symptoms attributable to addiction in the early stages of taking kratom

products, they do not attribute it to the kratom. Instead, kratom users then take more kratom

believing the kratom companies' claims that kratom will help them feel better.

24.     Long-term kratom users further report experiencing depression, anxiety,

anhedonia, and reduced sex drive due to their kratom use.

B.    **Kratom Use and Addiction in the United States**

25.    Kratom use in the United States has exploded over the past decade.  As of 2023, the American Kratom Association estimates that kratom is a 1.5 billion dollar a year industry, with 11-15 million annual users in the United States, up from 3-5 million users in 2016.

26.    Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

27.    However, kratom is still generally a relatively unknown substance to the average consumer, and most people have never heard of it.  Kratom sellers advertise that it is a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day. These kratom companies universally reiterate these purported "benefits" of kratom consumption, without disclosing any of the corresponding harms of kratom use.

28.    Further, because kratom does not produce as extreme of a "high" as cocaine or heroin, it is easy for users to take kratom daily without realizing they are developing an addiction and harming themselves.  This makes kratom particularly insidious as addiction sneaks up on unsuspecting and uninformed users.

29.    As a result of kratom manufacturers, retailers, and advertisers failing to warn consumers of kratom's addictive potential, many kratom users find themselves blindsided when they stop taking kratom and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement.  Further, because kratom is

relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid. Some kratom users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

30.    The reports from addicted kratom users are heart-wrenching. Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to kratom, and how difficult it was to stop their kratom use. Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 52,000 members as of August 2025:[4]

On August 14, 2025, one user wrote in a post titled "**Mitra-9 is absolutely insidious**": I have now gone through two stints each lasting five weeks of a mitra-9 habit in December and July. The first time I forced myself to quit because I had to travel. The withdrawals were relatively minor. **The shit is sold alongside energy drinks with zero disclaimer or age restrictions.** After coming in almost everyday the clerk asked me what it was and I replied it's an addictive drug I can't stop taking. Beginning of July I started up again this time drinking up to five cans a day and blowing more than $1K. I'm in day three of withdrawal and over the worst of it but holy hell this time was so much harder. The place I buy them from is two blocks away and they are never out. I don't trust myself to abstain on my own so l am beginning naltrexone next week.

One user wrote: "I've been on a 50gpd [grams per day] habit for about 4 years. Like most people here, **I was in denial that the Kratom was causing my multitude of issues. How could it be the Kratom when everyone keeps telling me how great it is?** I made myself believe that I had underlying issues that the Kratom was helping. Spoiler: It wasn't. **I slowly became a shell of the person I used to be. TRUE clinical depression symptoms with zero joy in my life.** I started browsing this subreddit and reading everyone's stories and I related to every single one. **Everyone had the same exact experience I had and at that moment I knew it was the Kratom causing my depression.**" (emphasis added).

A gas station employee wrote: "I work at a gas station where we sell kratom such as powders, gold and silver pills and especially shots etc (you know which one I'm talking about) **it's just mind blowing to me how many people are practically**

---

[4] *See* https://www.reddit.com/r/quittingkratom.

**addicted and how many customers literally scavenge their money to pay for their daily shot**.  Why are people so addicted especially to those shots."

Another user solicited "extract horror stories" – one user responded: "Took 2-3 shots a day for almost 2 years.  How did it screw me up?  Let me count the ways.  Financially it was draining me, 100%! **I would estimate 60% of my hair fell out.  My skin was grey.  My eyes were dark.  I became a hermit.**  No longer wanted to do anything, including self care or hygiene.  Just taking a shower was a chore I had to talk myself into the last few months.  I was disgusting and did not care at all. **All I cared about was that I had enough K for tomorrow."**

In response to the same "extract horror stories" post, another user responded: "I used [kratom extract] pills and sometimes the shots for over 5 years.  I'm now 290 days clean from them. **They were so hard to kick bc of how addicting they are.**  And you can just walk in the store and buy them.  I was spending $45 day on this stuff. **I wasted tens of thousands of dollars on it and my life suffered.**  Lots of my hair fell out and it's only now starting to grow back some, I think most of it is gone for good.  I'm repairing my marriage and friendships.  Everything.  Stay away from this stuff."

Another user responded: "Amen.  This shit got hold of me as bad as anything else I've ever done... spent WAY more money on these fucking things than real honest to God hard drugs back in the day. **Anywhere from 6-10 of these things daily for... years.  Let's call it 7 at an average of $18/pop = $126/day x 30 = $3780/month = about $45k/year.** How fucking embarrassing.  I made $140,000 last year living in Georgia (pretty low cost of living) and pretty regularly get busted "borrowing" money from my 10 year old son.  Fuck this; I'm not living like this anymore."

About 2 years ago, another user wrote: "I saw 'A Leaf of Faith' and got the impression that kratom was a generally friendly substance to use freely, never knowing how addictive it was, how much it was further numbing me beyond how alcohol already was, how it was slowly wiping out my sex drive, and likely contributing to my perpetual brain fog. … My second attempt [at quitting] was maybe another 7 or 8 months later.  Kratom was making me pretty miserable.  I was reading posts in this subreddit and I was finally aware of how addicted I was; feeling crappy, sluggish, and sorta spacey pretty much all the time."

About 2 years ago, another user wrote: "What a difficult journey it has been.  I was a ~75 GPD [grams per day] user. **Quitting kratom was one of the hardest things I've had to do in my life.**  I learned the hard way that kratom causes withdrawals on a work trip 3 years ago.  I should have stopped then and there but I gave in because the RLS was so bad. … **Kratom withdrawal is seriously no joke so don't think you're the only one struggling so much.**  I'm only a week free but after this experience I know for sure that I will never go back.  Good luck everyone!" (emphasis added).

About 2 years ago, another user wrote a post titled *Kratom Is An Addictive Drug*. It said, in part: "It's been 23 hours since my last dose. **I just wanted to give my story hoping that it would help others see that they've been lied to, deceived and manipulated into thinking this plant is 'harmless and safe'.** As a matter of fact, reading the horror stories on this subreddit was the first step in my recovery... I started taking it almost 3 years ago after hearing about it on... well, Reddit. They touted it is a miracle plant that had all the benefits of an opioid with none of the side effects." (emphasis added).

About 19 months ago, another user wrote: "**I think the perfect word to describe Kratom addiction is 'insidious'.** Here is the definition – *'proceeding in a gradual, subtle way, but with harmful effects.'* I think this is why it takes so long to realize what is going on. There was never a rock bottom moment for me like there would be for other more conventional abused drugs. No overdose, no bad behavior, no abusiveness to my family, no DWI, etc.. - It was just a lazy, slow descent into nothingness. I was living in a groundhogs day type of existence. Wake up, go to work, leave work, buy an extract shot or 2, have dinner, drink my shot, mindlessly look at my phone and/or watch TV. Wake up and do it all over again." (italic emphasis in original, bold emphasis added).

About 12 months ago, another user wrote: "I started using k[ratom] when I had knee surgery Dec 2019 so 3 years. **I didn't want to use pain killers because I got sober from alcohol 3/6/2018 and i felt the pain killers were going to make me relapse.** I didn't know I would end up in a worst place as I am now." (emphasis added).

About 2 years ago, another user wrote: "Was in bed all day yesterday fighting withdrawals. I used to even be an athlete - strong lean and fit, until I got on [kratom] shots and extracts. Didn't even get high any more - just wanted to not feel bad."

About 4 years ago, another user wrote: "I researched kratom before using it and almost every site promoted that its harmless with healthy benefits, and that its withdrawals are like coffee for 3 days max. Information wasn't clear that kratom could become a negative addiction that takes months to recover" … "**I took something I thought was helping me for 1.5-2 years, not even knowing the downsides bc that information was so misleading. It fucked up my digestion, energy, mood, brain fog, anxiety, etc. Fuck kratom, and fuck those who peddle it as a harmless cure-all**." (emphasis added)

About 10 months ago, another user wrote: "For any newcomers: this stuff is absolutely no joke. It's not harmless and the wd [withdrawal] is *definitely* **not** like caffeine. I've cold turkey'd caffeine before and I had a slight headache for a couple hours. I definitely have never woken up in a pool of my own sweat from not having my caffeine. … **This stuff is a drug. A serious drug. And it's super freakin**

**addictive**. *Extracts, powder, or in my case, capsules…it doesn't matter*. Yes some forms are more addictive than others but the WD is hellacious no matter how you're taking it." (emphasis added).

About 10 months ago, another user wrote: "This stuff is a drug, and dangerous! **I started taking it because of all the good things I heard and read about it**. I've never been addicted to or dependent on anything before, but this stuff has totally taken control of my life." (emphasis added).

About 9 months ago, another user wrote: "I finally realized a few weeks ago how much of a negative impact kratom was having on my life. I noticed myself planning my whole day around my doses and making sure when I left the house I'd bring an extra dose with me in a shaker bottle. It was heavily affecting my mood overall, but especially in public settings. I did not want to leave my house most days even if I did dose."

About 9 months ago, another user wrote: "I have been taking OPMS black pills for about a year now. It has ran my bank dry. When I wake up in the morning I fucking crave this shit. I have never been addicted to opiates or anything like that. I get to the point where I am going to go cold turkey and am so confident but when I wake up my brain makes me think its okay to go get it. I cant talk to anyone about this in my family or friends. I have a very high stress job and am also going through a nasty break up. I feel so alone with trying to stop and when I betray myself and go to get more, i fight back tears in the parking lot (I am a grown ass man). I am not an emotional person and in my environment theres no room for emotions. Should I tapper off? What the fuck do I do?"

About 3 months ago, another user wrote: "I was taking one to two opms gold shots a day (sometimes three) for about two years straight. When the 24hr mark hit the withdrawals kicked in hard. I had become absolutely obsessed with scavenging 20$ togther to make sure I got my shot each day. Constantly driving to the shop, hoping no one would see me pop out. I wanted to quit every night but just couldn't stand the withdrawals. I finally quit (on day 17 ct) with the help of a quit buddy I found in this sub. I'm still not right at all, RLS is there and my sleep is still off. I'm sneezing more than I ever have. But, music is back, I have more money in my pocket and I feel free from the grips. I've still got a long ways to go but am committed to never touching that shit again. It brought out the worst version of me."

31.    This Internet forum is filled with accounts just like these. The stories are consistent – well-meaning people who were looking to feel better, in mind body and spirit, by taking an "herbal supplement," only to end up with an opioid-like addiction.

32.     As these accounts make clear, the addictive potential of kratom is a material fact to reasonable consumers which would help inform their purchase and consumption decisions. Defendant's Products have no warnings, whatsoever, that kratom is similar to an opioid, is habit-forming, and that regular use will result in opioid-like dependency with withdrawal symptoms similar to those of traditional opioids.

33.     It is also clear that consumers are unaware of kratom's addictive nature, given the amount of people on the Quitting Kratom forum who have expressed surprise and shock at falling into addiction.  Were (correct) information widely available, consumers would not be reporting en masse to the forum with their stories.

34.     Consumers who knew the truth about kratom would not have purchased Defendant's Products.

### C.     Defendant Knew or Should Have Known it was Selling a Highly Addictive Drug to Unsuspecting Consumers

35.     Despite its traditional medical uses, kratom dependence has been known and observed for a long time and is well-documented in Southeast Asia, where the plaint originates and has the longest history of use.  Addiction to kratom among users in Thailand, Indonesia, and Malaysia has been documented by scientists and researchers in the United States since at least 1988.

36.     To reiterate, this is not an instance where scientific merit is still up for debate. Western civilization has known for decades that kratom is highly addictive and has the potential to cause physical and psychological dependence in regular users.  In Southeast Asia, it has been known for over a century that kratom is addictive.  For example, a 2007 study found that 2.3% of people in Thailand have used kratom, and that many of those users developed a dependence on kratom, with increasing doses required to avoid withdrawal.

37.     However, the fact that kratom's addictive potential has been known in the *scientific community*, does not mean that the general public is aware of it.  Indeed, most consumers do not know what kratom is and have no idea how addictive it is.

38.     Defendant operates under the brand name Mitra9 and sells kratom extract seltzers, shots, and powders.  But no matter what Product consumers take, they are exposed to significant levels of addictive alkaloids.

39.     Upon information and belief, Defendant has interacted with growers and distributors in Southeast Asia who have disclosed the addictive nature of kratom to it.

40.     Even without such interactions, Defendant has received numerous user reports about the addictive potential of kratom in the United States.

41.     Therefore, Defendant knew or should have known that the Products it was selling were highly addictive.

42.     Despite this knowledge, Defendant failed to disclose the addictive potential of its Products on its website or anywhere on its Products' packaging.

43.     Instead, Defendant advertises its Products like they are some sport drink for health-conscious individuals with an "active lifestyle.". Defendant's marketing includes pictures of bikini-clad women relaxing by the beach or fit men playing sports.  It is all clearly designed to mimic the health-conscious, outdoor, feel-good marketing emblematic of the supplement and health and wellness industries.

mitra9

SHOP ⌄    REWARDS ⌄    ABOUT US    STORE LOCATOR    WHOLESALE    FAQ

EXPERIENCE
# THE MITRA9 DIFFERENCE

Mitra9 compliments active lifestyles every day with our unique, plant-based beverages. Our specially designed formula offers a delicious alternative to help you sail through your workday or support your post-workout routine. Mitra9 is here to harmonize with your daily rhythm and help you remain focused on your goals. Crafted with the finest ingredients, Mitra9 products are caffeine-free, non-alcoholic, low-calories, and naturally flavored. We prioritize transparency in our process, providing lab tested results for our high-quality kratom and kava sourced responsibly. Savor the distinct taste of Mitra9 and buy online today.





## HIGH QUALITY KRATOM PRODUCTS

Mitra9 is excited to offer a superior selection of kratom, ethically sourced for exceptional quality and integrity. Our kratom is obtained from the verdant rainforests of Southeast Asia, benefiting from the expertise of local farmers dedicated to sustainable practices. We carefully process each batch to maintain the botanical's inherent qualities. Mitra9's kratom is designed to complement your daily routine, offering a unique blend that supports overall vitality and well-being, fostering focus and a serene approach to life's challenges. Discover the unique benefits of our kratom, a testament to our commitment to excellence and consistency in every product.

**SHOP PREMIUM KRATOM**

44.    Indeed, for its Blue Razz Kava Kratom Shot, Defendant markets the Product as if it were a harmless "pick-me-up" and packages the Product in a bottle that looks just like a 5-hour energy drink.



45.    By using phrases like "[f]orget ordinary supplement drinks this unique blend of

SPARK YOUR DAY WITH BLUE RAZZ
KRATOM KAVA SHOTS!

Tired of the same old routine? The Blue Razz Kratom Kava Shot is
here to break you free. With a bold blue raspberry flavor, only 20
calories, and just 5g of sugar, this shot is your next-level pick-me-
up. Forget ordinary supplement drinks this unique blend of
kratom and kava is the perfect way to shake things up.

And with a 12-month shelf life, you can keep Blue Razz ready
whenever you need it. Whether you're looking to fuel your day or
just want something new, this shot will bring the spark you're
missing. Ready for an upgrade?

kratom and kava is the perfect way to shake things up," Defendant downplays the seriousness of

the drug it is selling to consumers and instead attempts to conjure an impression of kratom as an

all-natural alternative to caffeine. Such language is deceitful and harmful to consumers who rely

on Defendant's Product statements when making their purchasing decisions. The back of the

label also fails to include any warning whatsoever about the Product's addictive nature.

46.     Defendant's seltzers are also marketed specifically as "non-alcoholic", likely to

entice consumers to purchase the Products who already are seeking to avoid the addictive

tendencies that drinking can trigger. Furthermore, they look almost identical in design to energy

drinks like Red Bull or Celsius, and can be found directly next to them on store shelves, which

may lure unsuspecting consumers in who have no idea they are buying a *liquid opioid*.

  

47. There is no warning to consumers that the Products interact with opioid receptors, nor is there any warning that the Products are highly addictive and should not be taken on a daily basis.

48. Further, the packaging itself is innocuous. The light colors, pictures of leaves and fruit, and the constant representations of "good vibes" evoke a sense of lightness and connection to nature. Nothing about this packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that act on the same mu-opioid receptors in the brain as opioids do. Nor would the packaging lead reasonable consumers to presume that kratom is highly addictive.

49. Addiction is a disease, a medical condition. Thus, any product which carries an addiction risk poses a concurrent health hazard, which is a material fact to consumers. Accordingly, Defendant's Products carry the threat of an unreasonable health hazard which Defendant was obliged to disclose to consumers on its Products' packaging.

50. Further, those seeking to avoid alcoholism and other addictions may be drawn in by Defendant's statements about kratom without knowing that they risk trading one addiction for another. Defendant has an obligation not only to remove such harmful statements from its website, but to warn consumers about the potential risks of taking kratom and to provide such a warning on the Product labels.

51. The consequences of kratom addiction are not mild: "in humans, opioid-like withdrawal symptoms have been reported following cessation of kratom use," though "the withdrawal syndrome appears to be less severe than withdrawal from morphine."

52. While kratom withdrawal may be "less severe" than morphine withdrawal, that is hardly a seal of approval – morphine withdrawal is one of the most unpleasant experiences that

one can endure in modern life.  And kratom withdrawal, while perhaps "less severe" than morphine withdrawal, is still an "opioid-like withdrawal" (according to the World Health Organization), with the same physical and mental symptoms.

53.    The risk of "opioid-like withdrawal symptoms" is a material fact to reasonable consumers.

54.    As a kratom product manufacturer and distributor, Defendant occupied a position of superior knowledge to the average reasonable consumer, who likely knows next to nothing about kratom.

55.    Defendant, through its misleading advertising and its failure to disclose kratom's addictive properties on its Products' labels, relied upon the average consumer's incomplete knowledge of kratom to sell its Products and get users addicted to kratom.

56.    The very fact that Defendant possesses the capability to manufacture these Products shows that it understands the pharmacokinetic nature of kratom and the substantial risk of addiction that it poses to consumers.  Despite this, Defendant markets its Products as if they are nothing more than over-the-counter energy drinks or nootropic supplements.

57.    Defendant fails to disclose kratom's addictive potential because Defendant knows that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendant's detriment.

58.    By any metric, Defendant's conduct is immoral, unethical, and contrary to New York public policy.

59.    The United States is going through an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosures of its Products' risks and through the use of false

and misleading packaging.  That cannot – and should not – be allowed, at least when their

conduct entails breaches of warranty and violation of state consumer protection statutes (as it

does here).

## CLASS ALLEGATIONS

60. ***Class Definition***.  Plaintiff brings this action as a class action pursuant to Federal

Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of himself and all other

similarly situated consumers, and seeks to represent a class (the "**Class**") defined as:

> All persons in New York who, within the applicable statute of
> limitations period, up to and including the date of final judgment in
> this action, purchased Mitra9 brand kratom products.

61. Specifically excluded from the Class are Defendant and any entities in which

Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this

action is assigned, members of the judge's staff, and the judge's immediate family.

62. Plaintiff reserves the right to amend the definition of the Class if discovery or

further investigation reveals that the Class should be expanded or otherwise modified.

63. ***Numerosity.***  Members of the Class are so numerous that their individual joinder

herein is impracticable.  On information and belief, the Class comprise of at least thousands of

consumers throughout New York.  The precise number of Class members and their identities are

unknown to Plaintiff at this time but may be determined through discovery.  Class members may

be notified of the pendency of this action by mail and/or publication through the distribution

records of Defendant.

64. ***Commonality and Predominance***.  Common questions of law and fact exist as to

all Class members and predominate over questions affecting only individual Class members.

Common legal and factual questions include, but are not limited to:

a. whether the labels on Defendant's Products have the capacity to mislead reasonable consumers;

b. whether Defendant knew that kratom is a highly addictive substance;

c. whether Defendant had a duty to inform consumers about the risks inherent to consumption of its Products;

d. whether Defendant's conduct alleged herein violated New York's General Business Law §§ 349 and 350;

e. whether Defendant's conduct constitutes fraudulent omission;

f. whether Plaintiff and the Class are entitled to damages and/or restitution; and

g. whether Plaintiff and the Class are entitled to attorneys' fees and costs.

65.    ***Typicality.***  Plaintiff's claims are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to inform Plaintiff and all others similarly situated that its Products are highly addictive and operate similarly to opioids.

66.    ***Adequacy***.  Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

67.    ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

68.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and will likely retain the benefits of its wrongdoing.

69.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**<u>COUNT I</u>**
**Violation of New York  General Business Law § 349 ("GBL"),**
**(On Behalf of Plaintiff and Class Members)**

70.     Plaintiff realleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

71.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

72.     This claim is brought pursuant to the laws of the State of New York.

73.     New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

74.     Defendant committed deceptive acts and practices by employing false, misleading, and deceptive representations and/or omissions about the addictive properties of their Products and the serious risk of addiction.

75.     Information as to the potential addiction risks of their Products was in Defendant's exclusive control.  Plaintiff could not possibly have known that the Products at issue would pose a serious risk of addiction because such information was not available to the public.

76.     Defendant's deceptive acts and practices were directed at consumers.

77.     Defendant's deceptive acts and practices are misleading in a material way because they violate consumers' reasonable expectations.  Defendant knew consumers would purchase

the Products and/or pay more for them under the false – but reasonable – belief that they were safe to consume regularly and did not pose a serious risk of addiction.

78.     Defendant knows that health information about their Product is material to consumers.  If such information were not material, Defendant would not market the Products as "all natural."  As a result of its deceptive acts and practices, Defendant sold tens if not hundreds of thousands of kratom Products to unsuspecting consumers across New York.

79.     If Defendant had advertised the Products truthfully and in a non-misleading fashion, Plaintiff and other Class Members would not have purchased them or would not have paid as much as they did for them.

80.     As a direct and proximate result of Defendant's false, misleading, and deceptive representations and/or omissions, Plaintiff and other Members of the Class were injured in that they would not have purchased the Products, or would have paid substantially less for them, but for Defendant's misrepresentations and omissions concerning the addictive properties of their kratom Products.

81.     On behalf of himself and Members of the Class, Plaintiff seeks to recover his actual damages, statutory damages of $50 per unit sold in the state, three times actual damages, and reasonable attorneys' fees.

### COUNT II
### Violation of New York GBL § 350,
### (On Behalf of Plaintiff and the Class Members)

82.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

83.     Plaintiff brings this claim individually and on behalf of the Class against Defendant.

84.     This claim is brought pursuant to the laws of the State of New York.

85.     New York General Business Law Section 350 provides, in part, as follows: False

advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

86.     New York General Business Law Section 350-A(1) provides, in part as follows: "The term 'false advertising,' means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representation made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual."

87.     Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent and fail to disclose the existence of serious potential for addiction in their Products.  By misrepresenting the true contents of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

88.     Defendant had exclusive knowledge of the addictive nature of their Products.

89.     Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of the Products they purchase, and the nature of the ingredients therein.

90.     As a result of Defendant's misrepresentations and omissions, Plaintiff and members of the Class have suffered economic injury because they would not have purchased the Products, or would have paid substantially less for them, if they had known that the Products posed a serious risk for addiction.

91.     Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

92.     As a result of Defendant's recurring, unlawful deceptive acts and practices, Plaintiff and the Class Members are entitled to monetary, statutory damages of $500 per unit sold, compensatory, treble and punitive damages, restitution, and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## <u>COUNT III</u>
## Fraud by Omission

93.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

94.     Plaintiff brings this claim individually and on behalf of the Class against Defendant under the laws of the State of New York.

95.     Defendant distributed their Products throughout the State of New York.

96.     Defendant misrepresented that the kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

97.     Defendant knows that kratom is addictive because it interacts with kratom vendors, has been made aware of user reports, and is in possession of studies regarding kratom addiction and manufactures a wide variety of kratom products using different extraction methods.

98.     Defendant knows that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

99.     The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access reliable information.

100.    Defendant therefore had a duty to Plaintiff and the members of the Class to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

101.    Consumers reasonably and justifiably relied on Defendant's omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

102.    As a result of Defendant's omission, Plaintiff and the members of the Class paid for kratom Products they would not have purchased.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all members of the proposed class the following relief against Defendant:

a.    For an order certifying the Class and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.    For an order declaring Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief; and

g.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues so triable.

Dated: August 15, 2025                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  */s/ Caroline Cella Donovan*
          Caroline Cella Donovan

Caroline Cella Donovan
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone:  (646) 437-6409
Facsimile:  (212) 989-9163
Email:  cdonovan@bursor.com